118

THE STATE OF OHIO, APPELLEE, *v.* HALE, APPELLANT.

[Cite as *State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426.]

(No. 2005–1678—Submitted December 11, 2007—Decided July 15, 2008.)

MOYER, C.J.

{¶ 1} On June 21, 2004, defendant-appellant Delano Hale Jr. killed Douglas Green by firing four bullets into his head. He then stole Green's Visa card and SUV. Hale was convicted of aggravated murder with an aggravated-robbery specification and was sentenced to death.

{¶ 2} In 2003, Hale was released from prison after serving 12 years of a sentence for aggravated robbery and carrying a concealed weapon. At first, he lived with his father, but left in February 2004. That same month, he obtained a telemarketing job with a base pay of $7.64 per hour. On March 9, 2004, Hale told his sister Lashayla that he had a gun.

{¶ 3} By June 2004, Hale was in financial difficulty. His bank account had a negative balance during all of June 2004. On June 8, he moved into Room 260 of the Lake Erie Lodge, a motel in Euclid. He initially rented the room for a week. He renewed his stay for another week on June 15, renewed for a single night on June 22, and checked out on June 23.

{¶ 4} On June 23, 2004, an employee of the lodge found a human corpse wrapped in plastic garbage bags in Room 231, a vacant room being used for storage. He notified the management, who summoned the police. The body was identified as that of Douglas Green, a local voice teacher, professional singer, and music producer.

{¶ 5} An autopsy disclosed that Green had been shot four times in the right side of the head. Two shots went into Green's right ear, one entered his skull directly behind the ear, and one entered about two and one-half inches behind the ear. Three of the four shots entered Green's brain. Any one of these three wounds would have immediately stopped any voluntary movement on Green's part. Three of the wounds were contact wounds, meaning that the shots were fired from no more than an inch away. Gunshot residue was found on Green's right hand, but not his left, an indication that Green's right hand was in close proximity to the gun when it was fired.

{¶ 6} Green's bank statement shows that at 12:07 p.m. on June 22, 2004, a person using Green's Visa card made a $55.15 purchase at a Giant Eagle store in Willoughby Hills. Giant Eagle records show that the purchaser bought garbage bags, cleaning supplies, beer, and cigarettes in that transaction. Green did not smoke or drink beer. The purchaser also used a Giant Eagle discount card registered to Hale's sister and deceased mother.

{¶ 7} Hale's friend James Hull saw Hale driving a Explorer SUV on two occasions after Green's murder, including on June 23, 2004, when Hull helped Hale move out of the lodge. Hull later identified photographs of Green's SUV as the one Hale had been driving.

{¶ 8} On June 28, 2004, at 2:30 p.m., Detective Sergeant Robert Pestak of the Euclid police found Hale inside Green's Ford Explorer SUV, parked near Hale's workplace in Cleveland. Pestak, supported by Cleveland police units, arrested Hale.

{¶ 9} When told that he was being arrested for Green's murder, Hale said, "I didn't kill anybody." Sergeant Pestak administered *Miranda* warnings to Hale. While being led to a cruiser, Hale again said, "I didn't kill anybody."

{¶ 10} Hale was taken to the Euclid police station and placed in a cell. After approximately five hours, Hale was removed from the cell and brought to the detective bureau. There, Detective Sergeant James Baird completed a personal-information form on Hale and presented it to Hale for his signature. Hale signed the form using his left hand, but Baird noted that Hale had difficulty writing with that hand.

{¶ 11} Baird then administered *Miranda* warnings to Hale. Hale signed a *Miranda* waiver form, and this time, Hale used his right hand. Baird proceeded to interrogate Hale. During the interrogation, Baird told Hale that Green "was possibly bisexual" and that "if this was a case of self-defense, then that would be understandable if he felt that Mr. Green had attacked him."

{¶ 12} Hale wrote out and signed a four-page statement. In his statement, Hale claimed that he had met Green in May 2004 when Green, identifying himself as a record producer, asked Hale whether he had considered singing professionally and gave Hale his cell-phone number. According to Hale, he later called Green, and Green agreed to go to Hale's motel room to hear him sing.

{¶ 13} According to Hale, they had arranged to meet at the Underground Railroad, a bar near the lodge. Hale claimed that he and Green had met at the Underground Railroad on Monday, June 21, 2004. (However, according to the owner of the Underground Railroad, that establishment was closed on Mondays.) They then went to Hale's room. According to Hale, Green had a small gun in his shoulder bag and displayed it to Hale as they entered the room.

{¶ 14} Hale claimed that he sang for Green, then went to the bathroom. Hale claimed that when he returned, he found Green lying on the bed, nude. Hale told Green to leave. According to Hale, Green grabbed Hale's wrists and "laid his head on [Hale's] crotch" while making "slurping" noises.

{¶ 15} Hale claimed that he then freed his *right* hand, reached into Green's bag, pulled out the gun, held it to Green's head, and cocked it. According to Hale, Green said, "It isn't loaded, so why don't you give me some of that dick."

{¶ 16} Hale fired. Green "reeled back," but still gripped Hale's left wrist, according to Hale. Hale cocked the gun and fired again. He then backed away from Green, took some bullets from Green's bag, and reloaded. According to Hale, Green then tried to stand up. Hale fired "once or twice" more.

{¶ 17} According to Hale, he considered calling an ambulance or the police, but decided not to after he "thought about * * * [his] record" and "the life [he] was attempting to build." Instead, he disposed of the gun and Green's belongings. Then he went out to buy cleaning supplies to clean up Green's blood, using Green's credit card because Hale's "funds were low." The next day, he wrapped Green's body in garbage bags, also purchased with Green's credit card, and dragged the body to a storage room.

{¶ 18} Hale was indicted on two counts of aggravated murder: one under R.C. 2903.01(A) and one under R.C. 2903.01(B). Each count carried a felony-murder death specification alleging murder during a robbery. Other counts charged aggravated robbery, tampering with evidence, and having a weapon while under disability.[1] Hale argued self-defense, contending that Green had sexually assaulted him and that Hale had shot him to keep from being raped.

{¶ 19} On June 7, 2005, Hale was convicted of all counts and specifications, and he was sentenced to death for the aggravated murder of Green. He appeals his convictions and death sentence, raising 22 propositions of law for our review.

## I. *Miranda* Issues

{¶ 20} In his third proposition of law, Hale contends that the trial court erred by denying his motion to suppress the oral and written statements he gave Sergeant Baird on June 28, 2004.

{¶ 21} Sergeant Baird initially questioned Hale in order to obtain his personal information before administering *Miranda*[2] warnings. Only after giving the *Miranda* warnings did Baird interrogate Hale about the murder. In response to Baird's post-*Miranda* interrogation, Hale gave Baird both oral and written

---

1. Another count charged Hale with escape, but that count was severed for trial.

2. *Miranda v. Arizona* (1966), 384 U.S. 436, 460–461, 86 S.Ct. 1602, 16 L.Ed.2d 694.

statements admitting that he had killed Green and setting forth his version of the killing.

{¶ 22} Hale argues that because Baird had asked him questions before giving *Miranda* warnings—even though the pre-*Miranda* questions did not deal with the murder in any way—his oral and written statements about the murder should have been suppressed.

{¶ 23} The record of the suppression hearing establishes the following sequence of events:

{¶ 24} Sergeant Pestak arrested Hale at approximately 2:30 p.m., June 28, and informed Hale of his *Miranda* rights, which Sergeant Pestak recited from memory. Hale was then driven to the Euclid police station, arriving at 3:35 p.m. Before his shift ended at 5:00 p.m., Sergeant Pestak asked Sergeant Baird to "get a personal history" from Hale.

{¶ 25} Pestak's request referred to the standard personal-history form used by the Euclid detective bureau. The form contains such information as the arrestee's name, address, age, phone number, Social Security number, physical description, employer, education, and the names of his immediate family members. The detective bureau routinely obtains this information from every felony suspect and uses it to complete the form. The bureau gathers this information for police records and to verify the arrestee's identity.

{¶ 26} At 7:50 p.m., Baird had Hale escorted from his cell to the detective bureau. For 20 to 25 minutes, Baird questioned Hale to obtain information for the personal-history form.

{¶ 27} When questioning finished, Baird told Hale that Baird "was going to talk to him briefly about the crime that he was being charged with, and that before [Baird] asked him any questions or talked to him at all about it, that [Baird] had to advise him of his rights." Baird asked Hale to read a form containing the *Miranda* warnings. Baird then read the *Miranda* form aloud to him. Baird asked if Hale understood his rights. Hale said yes and signed the form, acknowledging that he understood them. Baird then showed Hale the waiver portion of the *Miranda* form and told Hale that if he wanted to talk to Baird, he needed to sign the waiver. Hale signed the *Miranda* waiver at 8:22 p.m.

{¶ 28} Baird explained to Hale that he was under arrest for murder, then began what Baird described as a "soft interrogation." Baird discussed the case with Hale for about 20 minutes. Hale then orally stated his version of the events of June 21.[3] When Hale finished, Baird said, "I'd really like to get this on paper

---

3. The trial court later excluded Hale's oral statement (but not his written statement) pursuant to Crim.R. 16 as a sanction for the state's failure to make timely discovery. See discussion of section (A) of Hale's eighth proposition of law, below.

so we can have your side of the story." At 8:53 p.m., Baird gave Hale a statement sheet and asked him to write his statement in his own words. Over the next two hours, Hale wrote out a four-page statement, which was ultimately introduced at trial.

{¶ 29} Hale was given *Miranda* warnings twice on June 28: first by Pestak at 3:00 p.m., during his arrest, and then by Baird at approximately 8:15 p.m., just before he began to interrogate Hale about the murder. Hale contends that *neither* set of warnings was effective and that his statement should therefore have been suppressed.

{¶ 30} We need not determine whether Pestak's warnings were still effective by the time Baird interrogated Hale. See generally *State v. Roberts* (1987), 32 Ohio St.3d 225, 232, 513 N.E.2d 720. It is undisputed that Baird administered full *Miranda* warnings and obtained an express, written waiver immediately before he interrogated Hale about Green's murder.

{¶ 31} Hale argues that the *Miranda* warnings given by Baird were ineffective and should be ignored because Baird questioned him about his personal history before giving those warnings. Because Baird's warnings did not precede *all* questioning, including the personal-history questions, Hale contends that they were ineffective for *any* portion of the questioning.

{¶ 32} We disagree. Baird was not required to preface the personal-history questions with *Miranda* warnings. The personal-history questions were routine booking questions, and the requirement that police administer *Miranda* warnings before questioning a suspect in custody does not apply to routine booking questions.

{¶ 33} Routine booking questions are questions asked in order "to secure the 'biographical data necessary to complete booking or pretrial services.'" *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528, quoting *United States v. Horton* (C.A.8, 1989), 873 F.2d 180, 181, fn. 2. The personal-history questions in this case clearly fit within that definition. The information elicited for the personal-history form was routinely requested for record-keeping and identification purposes. Moreover, the personal-history form was not "designed to elicit incriminatory admissions." Id. at 602, 110 S.Ct. 2638, 110 L.Ed.2d 528, fn. 14. Hence, the personal-history questions were "reasonably related to the police's administrative concerns." Id. at 601–602, 110 S.Ct. 2638, 110 L.Ed.2d 528.

{¶ 34} Thus, no reason exists to suppress Hale's statement. Baird was not required to administer *Miranda* warnings any sooner than he did. By giving complete *Miranda* warnings and obtaining an express waiver before asking Hale any questions about the crime, Baird complied fully with the relevant constitutional requirements. That fact distinguishes this case from cases such as *Oregon*

*v. Elstad* (1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, and *Missouri v. Seibert* (2004), 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643, in which police first interrogated suspects about their crimes, then administered *Miranda* warnings, then engaged in further interrogation. Cf. *Seibert*, 542 U.S. at 616, 124 S.Ct. 2601, 159 L.Ed.2d 643 (plurality opinion) (postwarning interrogation was "a mere continuation" of prewarning interrogation) and 542 U.S. at 622, 124 S.Ct. 2601, 159 L.Ed.2d 643 (Kennedy, J., concurring) (postwarning interrogation was "related to the substance of [the suspect's] prewarning statements"). We therefore overrule Hale's third proposition of law.

## II. Character Evidence (Specific Instance of Victim's Conduct)

{¶ 35} In section (F) of his eighth proposition of law, Hale argues that the trial court erred by partly excluding defense testimony about a sexual assault Green allegedly committed in 1998.

{¶ 36} At trial, the defense claimed that Hale's killing of Green constituted lawful self-defense because Green had attempted to rape Hale. The state responded to this claim by calling witnesses to testify about Green's peaceful character. See Evid.R. 404(A)(2) (victim's peaceful character admissible to rebut evidence that victim was first aggressor). In response, the defense adduced the testimony of Johnny A. Smith that in 1998, Green had performed oral sex on him, forcibly and against his will.

{¶ 37} The state objected to Smith's testimony. Citing *State v. Barnes* (2002), 94 Ohio St.3d 21, 759 N.E.2d 1240, the state argued that the 1998 sexual assault could not be used to prove Hale's claim of self-defense. The defense argued that *Barnes* was inapplicable because the 1998 assault was being introduced only to rebut the state's evidence of Green's peaceful character, not to prove Hale's self-defense claim.

{¶ 38} The trial court agreed with the state that *Barnes* barred evidence about the 1998 sexual assault. Nevertheless, the trial court permitted Smith to testify that the assault had taken place, because Sergeant Baird had already mentioned the 1998 sexual-assault accusation in his testimony about Hale's interrogation. However, the trial court limited Smith's testimony to information the jury had already heard: that Green had sexually assaulted Smith in 1998 and that the assault had involved oral sex.

{¶ 39} On direct examination, the defense asked Smith whether Green had been "restraining" him during the assault. The state's objection to this question was sustained. Hale claims that the jury should have been allowed to hear Smith's answer.

{¶ 40} The parties' arguments address the applicability of our holding in *State v. Barnes*: "A defendant asserting self-defense cannot introduce evidence of

specific instances of a victim's conduct to prove that the victim was the initial aggressor." *Barnes*, 94 Ohio St.3d 21, 759 N.E.2d 1240, syllabus (applying Evid.R. 405(B)). As he did at trial, Hale argues that *Barnes* is inapplicable, because Smith's testimony was not offered to prove that Green was the initial aggressor, but rather "to rebut the good character evidence the State had presented."

{¶ 41} In our view, it does not matter whether the proffered testimony was offered to rebut the state's character evidence, as Hale suggests, or to prove that Green was the aggressor, as the state argues. Under Evid.R. 405, the testimony was inadmissible for *either* purpose.

{¶ 42} Evid.R. 405 governs methods of proving character, including the use of specific instances of conduct. Evid.R. 405 authorizes use of specific instances in only two situations: on cross-examination of the other party's character witnesses, Evid.R. 405(A), and in cases where "character or a trait of character of a person is an essential element of a charge, claim, or defense." Evid.R. 405(B).

{¶ 43} Under our holding in *Barnes*, Smith's testimony could not be used in direct support of Hale's self-defense claim, i.e., to prove that Green was the aggressor on June 21, 2004, because Evid.R. 405(B) authorizes specific instances of a person's conduct only when the person's character "is an essential element of a charge, claim, or defense" and the victim's character is not an essential element of a self-defense claim.

{¶ 44} If we accept Hale's claim that he offered Smith's testimony not to prove that Green was the aggressor but merely to rebut the state's evidence of Green's character, then Evid.R. 405(A) would apply, and *Barnes* would be inapplicable. But Evid.R. 405(A) does not authorize Smith's testimony either. Nothing in Evid.R. 405(A) allows a party to use *extrinsic evidence* of specific instances of a person's conduct to rebut the other party's evidence regarding that person's character. Accord *United States v. Benedetto* (C.A.2, 1978), 571 F.2d 1246, 1249–1251; *United States v. Pantone* (C.A.3, 1979), 609 F.2d 675, 680; *State v. Bourgeois* (Me.1994), 639 A.2d 634, 636–637; *People v. Champion* (1981), 411 Mich. 468, 471, 307 N.W.2d 681; *Spadafina v. State* (Tenn.Crim.App.2000), 77 S.W.3d 198, 212; *Daggett v. State* (Tex.Crim.App.2005), 187 S.W.3d 444, 454, fn. 24.

{¶ 45} Hale also argues that, pursuant to Evid.R. 404(B), the proffered testimony was admissible as "other acts" evidence for *non*character purposes. He argues that the testimony would have provided evidence of Green's intent to sexually assault Hale and of Green's modus operandi in committing such assaults. But Hale did not offer Smith's testimony for those purposes at trial. He offered it only on the issue of Green's character. Hence, he waived any argument for admissibility based on Evid.R. 404(B). See *Pantone*, 609 F.2d at 682.

{¶ 46} Finally, Hale claims that the exclusion of Smith's testimony denied him due process. We disagree. Due process requires only "that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta* (1984), 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413. Nevertheless, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois* (1988), 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798.

{¶ 47} In *United States v. Bautista* (C.A.10, 1998), 145 F.3d 1140, the court rejected a due process claim on nearly identical facts. Bautista, charged with murder, claimed to have killed the victim "in the heat of passion upon adequate provocation." The claimed provocation was that the victim had made a homosexual advance at Bautista. The defense proffered the testimony of a witness who claimed that the victim had once made such an advance at him. The trial court excluded this testimony, and the defendant was convicted. Id. at 1145, 1151.

{¶ 48} The court of appeals affirmed, noting that "the right to present defense witnesses is not absolute. A defendant must abide [by] the rules of evidence and procedure." Id. at 1151–1152. Thus, although evidence of the victim's aggressive character was admissible to show that he was the aggressor, the defense was not entitled to use specific instances of the victim's conduct to prove his aggressive character. Id. at 1152. Moreover, the trial court had allowed the defendant "to testify that he feared [the victim's] aggressive homosexual advances and that he had killed [the victim] in the heat of passion upon adequate provocation. In fact, in his confession, which he relied upon, that is the theory the jury heard." Id. Thus, the trial court "did not prevent [the defendant] from presenting a defense." Id.

{¶ 49} Like Bautista, Hale was able to present his self-defense claim to the jury by relying on his confession. Indeed, the trial court gave Hale greater leeway than Bautista received. Smith was permitted to testify about the alleged sexual assault by Green, notwithstanding Evid.R. 405. He was prevented only from stating that Green had restrained him. The trial court's (partial) enforcement of Evid.R. 405 did not deny Hale a "meaningful opportunity to present a complete defense" and hence did not violate Hale's right to due process. *Trombetta*, 467 U.S. at 485, 104 S.Ct. 2528, 81 L.Ed.2d 413. We overrule section (F) of Hale's eighth proposition of law.

### III. Other Evidentiary Issues

#### A. Expert Testimony

{¶ 50} In his tenth proposition of law, and in section (E) of his eighth proposition of law, Hale contends that the trial court erred by allowing prosecution witnesses Curtiss Jones and Michael Grida to give expert testimony.

{¶ 51} Curtiss Jones was the supervisor of the trace-evidence department of the Cuyahoga County coroner's office. He testified regarding blood spatter found in Hale's motel room. Hale argues that Jones had insufficient practical experience to qualify as an expert on blood-spatter evidence.

{¶ 52} Hale did not object at trial to the court's recognizing Jones as an expert. Hence, he has waived this issue unless he can demonstrate plain error.

{¶ 53} An alleged error is plain error only if the error is "obvious," *State v. Sanders* (2001), 92 Ohio St.3d 245, 257, 750 N.E.2d 90, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 54} No plain error occurred here. Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status on a witness. The witness offered as an expert need not have a complete knowledge of the field in question, as long as the knowledge he or she has will aid the trier of fact. *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 55} Jones testified that he has a master's degree in forensic science. Additionally, he underwent 48 hours of instruction in the field of blood-spatter analysis, had passed two proficiency tests in that field, and had testified three or four times previously on blood-spatter evidence. Jones testified that he deals with blood-spatter evidence "every day in terms of looking at evidence." Examining items "for the presence of biological fluid such as blood" is "one of the main things" he does, and when he does so, he applies his knowledge of blood-spatter analysis. In light of Jones's training and experience, the trial court did not commit any obvious error in permitting him to testify as an expert on blood spatter. Cf. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 362, 662 N.E.2d 311. Hence, no plain error exists, and this issue is waived.

{¶ 56} Hale also questions the reliability of blood-spatter analysis in general. However, we have recognized that blood-spatter analysis is a proper subject for expert testimony. *State v. Biros* (1997), 78 Ohio St.3d 426, 452, 678 N.E.2d 891.

{¶ 57} Michael Grida was a Euclid police detective. Using Hale's bank statements and ATM receipts, Grida testified that Hale had carried a negative bank balance in June 2004, the month of the murder. He also reconciled Hale's bank statement with an ATM receipt showing a negative balance of $1,099.84 in Hale's account.

{¶ 58} Hale objected to some of Grida's testimony, but not on the ground that Grida lacked expert qualifications. Hence, this issue is waived absent plain error. No plain error occurred here. Hale's financial situation gave him a motive for

robbery, but the aggravated robbery itself was firmly established by other evidence. In his statement to the Euclid police, Hale admitted stealing Green's SUV and credit card. Hale's friend James Hull saw Hale in possession of Green's SUV after the murder, and police found Hale inside Green's SUV when they arrested him. Green's bank records confirmed that Green's Visa card was used on June 22. Giant Eagle records provided additional evidence that Hale had used the Visa card at the Giant Eagle store.

{¶ 59} Hale's tenth proposition of law and section (E) of his eighth proposition of law are overruled.

### B. Prejudicial Evidence

{¶ 60} In section (B) of his eighth proposition of law, Hale contends that Robert Stewart gave inflammatory, irrelevant testimony. Stewart, a maintenance worker at the lodge, had seen Green's body in Room 231. The prosecutor asked him how that affected his emotions. Over a defense objection, the trial court permitted Stewart to answer. Stewart testified that seeing the body "shook [him] up pretty good" and that he "didn't work much the rest of the day."

{¶ 61} Because Stewart's emotional reaction to seeing the victim's body was irrelevant, the trial court erred by overruling Hale's objection. However, Stewart was a minor witness, and his testimony that seeing the body upset him was not inflammatory. The trial court's error was harmless.

{¶ 62} In section (C) of his eighth proposition of law, Hale contends that the testimony of Ricardo Cuffari and Vivian Wilson Jr. amounted to improper "victim-impact evidence." In response to Hale's self-defense claim, the state called Cuffari and Wilson, two friends of Green's, to testify that Green had a peaceful character. Hale claims that their testimony went beyond Green's character for peacefulness.

{¶ 63} First, Hale complains that Cuffari testified about Green's "business practices." Cuffari testified that it was not Green's "normal practice" to "audition" a potential student before agreeing to teach him. This testimony was relevant because it contradicted Hale's account of why Green was in Hale's hotel room.

{¶ 64} Hale also complains that Cuffari testified about Green's work in the music industry. Cuffari, who owned a recording and voice-coaching studio, testified that he had met Green after hearing him sing professionally; Green later became a coproducer at Cuffari's studio. Their relationship was originally a professional one, but they quickly became friends. This testimony was relevant to establish Cuffari's relationship with Green, and thus his knowledge of Green's character. "[T]o introduce opinion evidence the offering party must qualify the character witness by laying a foundation showing that the witness is sufficiently

acquainted with the accused or victim to have formed an opinion about that person's character." 1 Gianelli & Snyder, Evidence (2d Ed.2001) 253, Section 405.4.

{¶ 65} Finally, Hale argues that Cuffari's testimony that he and Green had prayed together should have been excluded. The prosecutor asked Cuffari, "[L]eading up to the point in time when Doug died, how would you describe the level of friendship between the two of you?" Cuffari replied: "Doug was probably one of my best friends at that time. * * * We called each other a lot on the phone. If there was problems on his side or my side, I would call for prayers and vice versa. When my mom was passing away he came to the hospital and prayed over my mom. He also sang in her funeral so you could see how direct it was. And he was a very, very close and dear friend."

{¶ 66} Cuffari briefly mentioned prayers as part of his response to the prosecutor's question about the "level of friendship" between Cuffari and Green. In this context, Cuffari was simply elaborating on Green's status as "one of [his] best friends," thus laying a foundation to establish his knowledge of Green's character.

{¶ 67} Hale complains that Vivian Wilson testified that Green did not smoke or drink beer. Wilson's testimony was relevant to the aggravated-robbery charge, because Green's Visa card was used at the Giant Eagle store to buy beer and cigarettes.

{¶ 68} Wilson also testified that the last time he saw Green, Green had greeted him by saying, "[G]ive me some love * * *." On that occasion, Wilson had asked Green to sing "Happy Birthday" for Wilson's son the next day. This testimony illustrated the close relationship between Green and Wilson and was thus relevant to Wilson's knowledge of Green's character. We reject section (C) of Hale's eighth proposition of law.

{¶ 69} In section (D) of his eighth proposition of law, Hale contends that State's Exhibit 151, a photograph of Green, was irrelevant and misleading. The photograph was taken from the cover of a compact disc containing songs by Green. In the photo, Green wears rings on both hands. The state introduced the photo to show that Green owned and wore jewelry, thus suggesting robbery as Hale's motive to kill him.

{¶ 70} Hale argues that the photo is misleading because it does not specifically show Green's appearance "at the time he met Hale at his motel room." We find this contention specious. Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This test is a broad one, and the photo clearly satisfies it. See 1 McCormick, Evidence (2006) 733–735, Section 185.

{¶ 71} Moreover, the photo created no danger of unfair prejudice; hence, no cogent argument exists to exclude the photo under Evid.R. 403(A). Hale offers no explanation to support his assertion that the photo "amounted to victim impact" evidence. Cf. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 57 (predeath photo of victim admissible). We reject section (D) of Hale's eighth proposition of law.

### C. Gruesome Photographs

{¶ 72} In his ninth proposition of law, Hale contends that he was prejudiced by the admission of gruesome and cumulative autopsy and crime-scene photographs. See generally *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267.

{¶ 73} State's Exhibits 27 and 28, although they are autopsy photographs, are not gruesome. Neither are the photographs of Green's body wrapped in opaque plastic bags, or those showing the bags after their removal from the body. Likewise, the crime-scene photographs are not gruesome, even though a few show small bloodstains on carpets, furniture, or walls. Thus, although some of these photos are cumulative, *Morales* does not apply to them.

{¶ 74} Six autopsy photos showing Green's head wounds can be characterized as gruesome. However, State's Exhibits 32, 33, and 34 are not repetitious or cumulative. Each one shows something the other does not. Exhibit 33 shows "fouling" around one of the bullet wounds that indicates it was a contact wound. Exhibit 32 does not show fouling, but does depict the probes that the coroner inserted into the bullet holes to show the angles of entry. Exhibit 34 also shows the probes, but from an angle different from that in Exhibit 32.

{¶ 75} On the other hand, State's Exhibit 31 appears to show nothing not shown by Exhibit 33, and Exhibit 30 appears to be merely a closer view of Exhibit 29. Nevertheless, we find no prejudice and no reversible error in the admission of two cumulative photographs. Cf. *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 230, 744 N.E.2d 163 (cumulative effect of several repetitive autopsy photographs was harmless). We therefore overrule Hale's ninth proposition of law.

### IV. Jury Issues

### A. Life Qualification

{¶ 76} In his fifth proposition of law, Hale claims that the trial judge conducted voir dire in a one-sided, and therefore unfair, manner. According to Hale, the judge death-qualified each prospective juror without any request by the prosecution, but he did not similarly "life-qualify" each prospective juror—i.e., he did not ask those jurors questions to determine whether they would automatically vote for the death penalty. See generally *Morgan v. Illinois* (1992), 504 U.S. 719, 729,

112 S.Ct. 2222, 119 L.Ed.2d 492. Hale alleges that "the trial court failed to ask life-qualifying questions of at least 28 prospective jurors."

{¶ 77} Crucially, Hale does not contend that the trial judge *prevented* defense counsel from life-qualifying the jurors. Instead, he argues that "the trial court's conduct of voir dire was biased" because the judge asked death-qualifying questions himself, but left it to defense counsel to ask life-qualifying questions.

{¶ 78} Hale has failed to preserve his claim that the trial judge was not impartial. Such claims must be raised by filing an affidavit of disqualification with the chief justice of this court. Hale did file such an affidavit in this case, but that affidavit made no allegation concerning the conduct of the trial judge during voir dire. See *In re Disqualification of Ambrose,* 110 Ohio St.3d 1220, 2005-Ohio-7154, 850 N.E.2d 722.

{¶ 79} Moreover, the claimed error does not reach the level of plain error. In the first place, the record shows that the trial judge asked numerous prospective jurors whether they could consider mitigating factors or whether they would automatically vote for a death sentence. In many cases, the judge asked *both* questions.

{¶ 80} Second, the trial court had no obligation to personally life-qualify the jurors. *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329, syllabus; *State v. Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 164–167. The fact that the judge did ask death-qualifying questions did not create any such obligation. The fact remains that the trial judge did not prevent defense counsel from asking such questions, and counsel in fact did ask such questions without hindrance. Hale provides no support for his assertions that the trial judge's method of proceeding caused the seating of a "death-prone jury." We overrule Hale's fifth proposition of law.

## B. Juror Misconduct/Misunderstanding

{¶ 81} In his sixth proposition of law, Hale contends that the jurors did not understand the concept of aggravating circumstances and that they committed "juror misconduct" by considering nonstatutory aggravating circumstances.

{¶ 82} Both claims are based solely on statements that two jurors made on voir dire. In explaining that he was not opposed to capital punishment, one juror stated: "I'm assuming that the aggravated circumstances would mean like something like extreme brutality * * *." Another juror said she "would have to decide by what was presented as far as the reason or the cause of death, how it was done, why it was done."

{¶ 83} These statements, made on voir dire—before the jury had even been selected, much less formally instructed as to the meaning of aggravating circum-stances—cannot support an inference that the jurors either misunderstood or

disobeyed the instructions they later received in the penalty phase. We overrule Hale's sixth proposition of law.

## C.  Failure to Excuse Jurors for Cause

{¶ 84} In his seventh proposition of law, Hale contends that three prospective jurors should have been excused for cause.

{¶ 85} Prospective juror No. 33 stated early in her voir dire that a defendant who took a life should get death and that she did not think she could consider a life sentence. But in later questioning, she retreated from that position. She ultimately abandoned it altogether, affirming that she could set her personal views aside and consider mitigating factors in accordance with the trial court's instructions. Hale challenged juror No. 33 for cause as an automatic-death-penalty juror, but the trial court overruled his challenge. The defense later eliminated this juror with a peremptory challenge.

{¶ 86} No Sixth Amendment violation took place, because juror No. 33 ultimately did not sit on the jury. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma* (1988), 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80.

{¶ 87} As a matter of state law, we have "recognized that where the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial." *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144. However, "[a] defendant in a criminal case cannot complain of prejudicial error in the overruling of a challenge for cause if such ruling does *not* force him to exhaust his peremptory challenges." (Emphasis added.) *State v. Eaton* (1969), 19 Ohio St.2d 145, 48 O.O.2d 188, 249 N.E.2d 897, paragraph one of the syllabus, vacated in part by *Eaton v. Ohio* (1972), 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750. Thus, "[i]f the trial court erroneously overrules a challenge for cause, the error is prejudicial only if the accused eliminates the challenged venireman with a peremptory challenge *and* exhausts his peremptory challenges before the full jury is seated." (Emphasis added.) *State v. Tyler* (1990), 50 Ohio St.3d 24, 30–31, 553 N.E.2d 576.

{¶ 88} In this case, Hale did expend a peremptory challenge on juror No. 33, but he used only five of his allotted six peremptories. Thus, the trial court did not force Hale to exhaust his peremptories when it overruled his challenge to juror No. 33. That ruling was therefore nonprejudicial.

{¶ 89} Jurors No. 4 and 5 served on the jury. But Hale waived any objection to their service. First, he declined to challenge either one for cause. Second, he did not exhaust his peremptories, and he thereby "acquiesced in the jury that was

finally selected." *State v. Carter* (1970), 21 Ohio St.2d 212, 214, 50 O.O.2d 446, 256 N.E.2d 714; see also *State v. Stallings* (2000), 89 Ohio St.3d 280, 288, 731 N.E.2d 159. Finally, defense counsel expressly stated that they were satisfied with the jury. See *Eaton*, 19 Ohio St.2d at 149, 48 O.O.2d 188, 249 N.E.2d 897.

{¶ 90} The trial court did not commit plain error in failing to excuse jurors No. 4 and 5 sua sponte. The record does not show that they were automatic-death-penalty jurors. Juror No. 4 thought he could consider all sentencing options. He agreed that the death penalty is "for a very few select people" and should not be imposed on all murderers without regard to mitigating circumstances.

{¶ 91} Juror No. 5 thought that sex murderers and child murderers should be executed and that in cases such as Charles Manson's, "you really want to see that person hang." Otherwise, she stated, it depended on the individual case. These statements in no way suggest that juror No. 5 would vote automatically for a death sentence in this case.

{¶ 92} Indeed, juror No. 5 appeared uncertain that she could sign a death verdict and was reluctant to answer that question without knowing the circumstances of the case. She understood that the death penalty "is reserved for only a few." She said that she could consider mitigating factors and would consider all sentencing options. She said, "I may not vote for the death penalty in this instance. I might think something lesser would be appropriate."

{¶ 93} Hale has waived his claims with respect to jurors No. 4 and 5, and the trial court did not commit plain error in allowing them to sit. We therefore overrule Hale's seventh proposition of law.

## V. Trial–Administration Issues

### A. In Camera Inspection of Statements

{¶ 94} Crim.R. 16(B)(1)(g) provides for the in camera inspection of a witness's written or recorded out-of-court statement to determine whether the statement is inconsistent with the witness's testimony (in which case it may be used in cross-examining the witness). Under the rule, counsel for both parties "must be given the opportunity to: (1) inspect the statement personally; and (2) call to the court's attention any perceived inconsistencies between the testimony of the witness and the prior statement." *State v. Daniels* (1982), 1 Ohio St.3d 69, 1 OBR 109, 437 N.E.2d 1186, syllabus. In his first proposition of law, Hale contends that his trial counsel were not allowed to participate in the trial court's in camera review of several witnesses' prior statements.

{¶ 95} Hale's strongest claim involves a police report written by Sergeant Baird. At a pretrial suppression hearing, the trial court reviewed Baird's report, but Hale's counsel were not allowed to participate in that review.

{¶ 96} However, the defense failed to preserve this issue. "[O]nce the trial court concluded that there were no inconsistencies between the statements and trial testimony * * *, defense counsel did not ask to review the statements or object to the procedure employed by the court * * *. Defense counsel merely accepted the trial court's decision that there were no inconsistencies * * *." *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 48. Thus, Hale "has waived all but plain error in regard to this issue." Id.

{¶ 97} There was no plain error here, because Hale "has failed to identify any inconsistencies that would warrant reversal." Id. at ¶ 49. The "inconsistencies" mentioned by Hale are actually details of the interrogation to which Baird testified but did not mention in his report. However, "[t]he fact that details may be lacking in a pretrial statement does not mean that inconsistencies exist for purposes of Crim.R. 16(B)(1)(g)." Id.

{¶ 98} Hale also claims that his counsel were not allowed to participate in the inspection of statements by James Hull, Hale's sister Lashayla, and Jude Nilsson, a carpenter at the Lake Ohio Lodge in 2004, but these claims are far less substantial. First, the record does not show that defense counsel were prevented from participating in the in camera inspection of statements by these three witnesses, and we decline to speculate on the matter. Thus, with regard to those statements, the factual premise for Hale's claims simply does not exist.

{¶ 99} Second, any issue was waived at trial, for the defense neither objected to the inspection procedure nor asked to review the statements. Id. at ¶ 48. And there was no plain error. As to Hull's statements, the claimed "inconsistencies" are again merely details that Hull mentioned in his testimony but that do not appear in his pretrial statements. Id. at ¶ 49. As for Lashayla Hale and Jude Nilsson, Hale fails to identify *any* purported inconsistencies between these witnesses' statements and their testimony. Hale's first proposition of law is overruled.

### B.  Proceedings in Defendant's Absence

{¶ 100} In his fourth proposition of law, Hale contends that trial proceedings were conducted in his absence. An accused has a fundamental right to be present at all critical stages of his criminal trial. However, "the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." (Emphasis added.) *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674, overruled on other grounds by *Malloy v. Hogan* (1964), 378 U.S. 1, 17, 84 S.Ct. 1489, 12 L.Ed.2d 653. The question is whether his presence has a "reasonably substantial" relationship to "the fullness of his opportunity to defend against the charge." Id. at 105–106, 54 S.Ct. 330, 78 L.Ed. 674.

{¶ 101} On May 12, 2005, Hale was absent during all or part of a brief, inconclusive discussion between the trial judge and counsel for the parties. The defense complained that the state was still disclosing evidence that should have been disclosed earlier. The state asserted that it had already informally disclosed the evidence in question and was now merely doing so "in a formal written fashion" for the record.

{¶ 102} Hale's "absence was not prejudicial because the jury received neither testimony nor evidence, and no critical stage of the trial was involved." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 145. Hale contends that his presence during this discussion "would have been important" because it "would have alerted him to the ineffective assistance of counsel he was receiving * * * which would have prompted him to raise the issue before the trial court." We reject this speculative claim.

{¶ 103} Hale was also absent from a proceeding in chambers on May 25, 2005. This proceeding involved a discussion of "technical and procedural and evidentiary matters," and defense counsel waived Hale's presence. Hale contends that counsel may not waive a client's right to be present, but he is incorrect. See, e.g., *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 144; *State v. Green* (2000), 90 Ohio St.3d 352, 372, 738 N.E.2d 1208. Moreover, Hale's absence was not prejudicial, as the jury received no testimony or evidence in his absence. See *Frazier* at ¶ 145.

{¶ 104} Hale also contends that he was not present during ten "pretrial hearings" held between August 23, 2004, and March 10, 2005. The record does not show that any hearings actually took place on the dates indicated. The trial court's docket and journal entries state only that "pretrial[s]" were held on those dates. These may have been pretrial *conferences*. See generally Crim.R. 17.1.

{¶ 105} Whatever the "pretrials" were, none of them was recorded.[4] "[T]he record must affirmatively indicate the absence of a defendant or his counsel during a particular stage of the trial." *State v. Clark* (1988), 38 Ohio St.3d 252, 258, 527 N.E.2d 844. As no record was made, we cannot determine whether Hale was absent from the pretrials in question. Hale's fourth proposition of law is overruled.

## C. Discovery Violation

{¶ 106} In section (A) of his eighth proposition of law, Hale contends that the trial court should have punished the state's noncompliance with its discovery orders by excluding Hale's oral statements to Sergeants Baird and Pestak.

---

4. Pretrial conferences need not be recorded if the defendant is represented by counsel. Crim.R. 17.1.

{¶ 107} Crim.R. 16(B)(1)(a)(ii) provides: "Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy * * * [w]ritten summaries of any oral statement * * * made by the defendant *or co-defendant to* * * * any law enforcement officer." This rule requires that the prosecution "reduce the [defendant's] statement to writing, in the form of a summary, to be provided to the defense during discovery." *State v. Bidinost* (1994), 71 Ohio St.3d 449, 456, 644 N.E.2d 318.

{¶ 108} At issue are Hale's statement to Pestak that he "didn't kill anybody" and Hale's statement to Baird that he had discarded the gun, Green's clothing and shoulder bag, and some towels in a dumpster outside the lodge. The state had informed defense counsel of the statements to Baird during a pretrial, but had failed to provide written summaries of either statement, as required by *Bidinost,* within the deadline set by the trial court.

{¶ 109} The trial court initially ordered that Hale's oral statement to Baird be excluded as a discovery sanction. However, the court did not exclude the statement to Pestak. Later, the trial court found that the defense had opened the door to part of Hale's oral statement to Baird—all except the part about the shoulder bag—and allowed Baird to testify to that portion of the statement.

{¶ 110} The prosecutor asked Sergeant Baird about Hale's admission that he had disposed of the gun and Green's clothing and shoulder bag. On objection, the prosecutor withdrew this question. The defense did not ask the trial court to strike the prosecutor's reference to the shoulder bag or to issue a curative instruction.

{¶ 111} The prosecutor then asked, "[W]hat did the defendant tell you he disposed of?" Baird replied, "He told me that he had disposed of the clothing, the gun *and the bag,* along with some towels." (Emphasis added.)

{¶ 112} Defense counsel objected and moved for a mistrial. At sidebar, the prosecutor suggested that Baird had been referring to a *garbage* bag that Hale had placed the gun and clothing in before disposing of them. The trial court determined that its order did not bar references to the garbage bag. Further questioning clarified that the "bag" mentioned by Baird was indeed a garbage bag.

{¶ 113} Crim.R. 16(E)(3) provides: "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

{¶ 114} We have held that Crim.R. 16(E)(3) vests the trial court "with a certain amount of discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material. The court is not bound to exclude such material at trial although it may do so at its option." *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 453 N.E.2d 689.

{¶ 115} *Parson* established guidelines for evaluating the trial court's exercise of discretion in this area: "Where, in a criminal trial, the prosecution fails to comply with Crim.R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made by a co-defendant to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim.R. 16(E)(3) by permitting such evidence to be admitted." *Parson*, 6 Ohio St.3d 442, 6 OBR 485, 453 N.E.2d 689, syllabus.

{¶ 116} None of the three *Parson* factors exists in this case. First, nothing in the record indicates that the state's failure to provide written summaries of Hale's oral statements in question was a *willful* discovery violation. To the contrary, the trial court expressly found that the prosecution had engaged in "no intentional withholding of the information."

{¶ 117} Second, there is no evidence that foreknowledge of the statements at issue would have benefited the defense. In fact, the defense *had* foreknowledge of these statements. As we have noted, the prosecution had orally informed the defense of Hale's statements to Baird before trial. While this conduct did not satisfy the requirement of a written summary, it clearly did provide the defense with foreknowledge of the statement.

{¶ 118} As for Hale's statements to Pestak that he "didn't kill anybody," the defense learned of them no later than May 9, 2005, when Pestak testified about that statement at the suppression hearing. That hearing occurred 22 days before Pestak testified at trial concerning those statements. Thus, "[w]hile the defense was entitled to a written summary of the statement[s], the record does not reflect that a written summary would have benefited appellant in the preparation of his defense." *Bidinost*, 71 Ohio St.3d at 457, 644 N.E.2d 318.

{¶ 119} Third, the record does not show prejudice. The defense was not surprised by these statements, because defense counsel had actual foreknowledge of their content. Nor did the defense request a continuance to prepare to cross-examine Pestak and Baird. Hence, "the trial court may have properly determined that appellant was prepared to proceed despite any claim of unfair 'surprise.' " *Bidinost*, 71 Ohio St.3d at 457, 644 N.E.2d 318. See also *State v.*

*Wiles* (1991), 59 Ohio St.3d 71, 80, 571 N.E.2d 97, citing *State v. Edwards* (1976), 49 Ohio St.2d 31, 42–43, 3 O.O.3d 18, 358 N.E.2d 1051.

{¶ 120} Finally, no due process issue exists here. "There is no general constitutional right to discovery in a criminal case * * *." *Weatherford v. Bursey* (1977), 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30. See also *Gray v. Netherland* (1996), 518 U.S. 152, 168, 116 S.Ct. 2074, 135 L.Ed.2d 457. In particular, a criminal defendant has no due process right to inspect his own confession. See *Leland v. Oregon* (1952), 343 U.S. 790, 801–802, 72 S.Ct. 1002, 96 L.Ed. 1302; *Cicenia v. La Gay* (1958), 357 U.S. 504, 510–511, 78 S.Ct. 1297, 2 L.Ed.2d 1523, overruled in part on other grounds, *Escobedo v. Illinois* (1964), 378 U.S. 478, 492, 84 S.Ct. 1758, 12 L.Ed.2d 977, fn. 15. We overrule section (A) of Hale's eighth proposition of law.

## VI. Exclusion of Proffered Mitigation

{¶ 121} In Hale's 11th proposition of law, he contends that the trial court improperly excluded relevant mitigating evidence from the penalty phase.

{¶ 122} Hale's three sisters, Latisha, Lashayla, and Laquatia, testified on his behalf in the penalty phase. During Lashayla's testimony, defense counsel asked: "What would it do to you if your brother was sentenced to death?" The state's objection was sustained.

{¶ 123} Hale claims this ruling was erroneous because the impact of the death penalty on the defendant's family is a relevant mitigating factor. The constitutional right of a capital defendant to present mitigating evidence includes any aspect of his character or record and any of the circumstances of the offense. *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973.

{¶ 124} However, a trial court may exclude proffered mitigation that is not relevant to the defendant's character, his record, or the circumstances of the offense. Id. at fn. 12. Several jurisdictions have held that testimony by the defendant's relatives concerning the impact that the defendant's execution will have on them is not relevant to the defendant's character, his record, or the circumstances of his offense and therefore may be excluded. See, e.g., *People v. Vieira* (2005), 35 Cal.4th 264, 295, 25 Cal.Rptr.3d 337, 106 P.3d 990; *People v. Armstrong* (1998), 183 Ill.2d 130, 154–155, 233 Ill.Dec. 252, 700 N.E.2d 960; *Ross v. State* (Miss.2007), 954 So.2d 968, ¶ 15; *Fuller v. State* (Tex.Crim.App.1992), 827 S.W.2d 919, 936; *State v. Stenson* (1997), 132 Wash.2d 668, 750–754, 940 P.2d 1239. Contra *State v. Stevens* (1994), 319 Or. 573, 584, 879 P.2d 162 (effect of execution on defendant's family is relevant to his character because it shows his capacity to be of emotional value to others).

{¶ 125} Even were we to conclude that the evidence should have been admitted, we would find in this case that any error was harmless. The trial

court's ruling was narrow. Although Lashayla was precluded from testifying as to how Hale's execution would affect her, she was permitted to testify that she loved him. Similarly, Latisha and Laquatia testified that they loved Hale and wanted to maintain a relationship with him. In addition, all three sisters were permitted to expound on Hale's good qualities. Thus, while staying within the bounds of the trial court's ruling, Hale's sisters were fully able to convey that they loved and valued their brother and to present aspects of his character that militated in favor of sparing his life. See *Vieira*, 35 Cal.4th at 295, 25 Cal.Rptr.3d 337, 106 P.3d 990; *State v. Loftin* (1996), 146 N.J. 295, 369, 680 A.2d 677 (any error would have been harmless; defendant presented character evidence that directly focused on his relationship with wife and child). We overrule Hale's 11th proposition of law.

## VII.  Penalty–Phase Evidentiary Issues

{¶ 126} In his 12th proposition of law, Hale argues that the trial court allowed inadmissible evidence in the penalty phase.

{¶ 127} Hale's sister Laquatia testified in the penalty phase. During her cross-examination, the state elicited testimony regarding a threat by Hale to kill his father. Laquatia testified that she had heard about the threat, but "wasn't present" when it was made. The defense objected, but did not state any grounds for the objection, and the trial court overruled it.

{¶ 128} Hale now advances three grounds for holding the testimony inadmissible. First, he argues that Laquatia's testimony was inadmissible hearsay. See *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 233, 744 N.E.2d 163 (hearsay rule applies to the penalty phase). Second, Hale argues that the prosecutor was "testifying," although he makes no attempt to explain this assertion. Third, he argues that Laquatia's testimony was inadmissible because it went to the issue of future dangerousness and showed that Hale was a person of bad character.

{¶ 129} However, Hale did not advance any of these grounds at trial. By failing to "stat[e] the specific ground of objection," Hale waived his claims. Evid.R. 103(A)(1). Hence, he can prevail now only if he shows that the admission of Laquatia's testimony was plain error.

{¶ 130} We find that it was not. Hale's sister Latisha testified that she was present at times when Hale argued with his father. On one such occasion, Hale threatened to kill his father, "but then he told him that he kn[e]w that he wouldn't die so he's not going to kill him. If anything he'll torture him." Laquatia's testimony regarding the death threat was thus merely cumulative of Latisha's testimony, whose admissibility Hale does not challenge.

{¶ 131} Hale also claims that the state improperly elicited evidence about Hale's having been paroled. On cross-examination, the prosecutor asked Dr.

John Fabian, the defense psychologist, about the length of the sentence from which Hale had been released in 2003. Fabian knew that Hale had served 12 years, but did not know the length of the original sentence. The prosecutor asked: "In fact, doctor, it was an indeterminate sentence of 12 to 25 years, was it not?" Fabian repeated, "I don't know." The prosecutor then asked: "[A]ssuming that that is accurate, * * * would you agree from your knowledge of the prison system that in order to be red lighted after the minimum term of an indeterminate sentence, the parole board reviewed the inmate's performance while in prison [and] was satisfied that parole was justified at that point?" Fabian said: "That seems logical to me." Fabian had not discussed parole on direct examination.

{¶ 132} Again, the defense made nonspecific objections to the prosecutor's questions. Thus, Hale has failed to preserve his claim and must demonstrate that it was plain error to permit Fabian to answer these questions. Raising the issue of parole on cross-examination may have been improper, see *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 98, but it was not clearly outcome-determinative. We therefore find that no plain error occurred. Moreover, our independent review of the death sentence will cure the error, as the possibility of parole will play no part in our analysis. Hale's 12th proposition of law is overruled.

## VIII. Penalty–Phase Instructions

{¶ 133} In his 13th proposition of law, Hale argues that erroneous instructions rendered the penalty phase unreliable.

{¶ 134} During closing argument, the prosecutor asked the jury to consider whether there was "any mitigation in" the circumstances of the crime, specifically the robbery and the defendant's attempts to conceal the murder. The defense objected on the ground that the prosecutor could not argue mitigating factors not raised by the defense. See *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542. The trial court sustained the objection and gave, without objection, the following curative instruction:

{¶ 135} "Mitigation evidence is the evidence that was presented by the defense during this portion of the trial or that would have been presented during the trial phase. *It does not exist within the context of the crime itself.*" (Emphasis added.)

{¶ 136} It is unclear what the judge meant by the last sentence of this instruction, but Hale contends that it can reasonably be understood to mean that the circumstances of the crime cannot be considered in mitigation. Such an instruction would, of course, be incorrect. See R.C. 2929.04(B) (sentencer "shall consider" the nature and circumstances of the offense).

{¶ 137} However, on the facts of this case, we cannot find that this instruction constituted plain error. The only "circumstances of the offense" in which Hale claims to find mitigation is that Green allegedly provoked the murder by making an unwanted sexual advance. However, the physical evidence is inconsistent with that claim. Furthermore, the trial judge did instruct the jury, correctly, that "duress, coercion or strong provocation" was a mitigating factor. Under these circumstances, it is unlikely that the jury would have imposed a life sentence even if the trial court had not given the instruction at issue. Hence, we cannot find that the instruction constituted plain error, and this claim is waived.

{¶ 138} The trial court also instructed the jury to consider "only that evidence admitted in the trial phase that is relevant to the aggravating circumstances and to any of the mitigating factors." This instruction was erroneous, as we have held it to be the trial court's responsibility to determine what guilt-phase evidence is relevant in the penalty phase. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866.

{¶ 139} Hale contends that this instruction was prejudicial because it allowed the jury to consider guilt-phase evidence about the gunshot wounds. However, the gunshot wounds were "neither irrelevant nor prejudicial to the penalty phase." *State v. Lindsey* (2000), 87 Ohio St.3d 479, 485, 721 N.E.2d 995. The execution-style nature of the murder—four shots, at least three at close range, to the head—tends to show prior calculation and design, which are elements of the felony-murder aggravating circumstance. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 330, 738 N.E.2d 1178. The wounds also disprove Hale's story of a sexual assault by Green, thus refuting the claimed mitigating factor of provocation. In any event, the nature and circumstances of the offense are relevant and must be considered in the penalty phase. See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus; *State v. Hill* (1996), 75 Ohio St.3d 195, 201, 661 N.E.2d 1068; *State v. Fears* (1999), 86 Ohio St.3d 329, 345, 715 N.E.2d 136, quoting *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542.

{¶ 140} In fact, practically all the guilt-phase evidence was relevant to the aggravating circumstance, the nature and circumstances of the offense, or the claim of provocation. Thus, the trial court's instruction was not prejudicial. See *State v. Jones* (2001), 91 Ohio St.3d 335, 350, 744 N.E.2d 1163.

{¶ 141} In his 14th proposition of law, Hale contends that the trial judge was biased in favor of a death sentence. He bases this claim on what the trial judge said on June 16, 2005, when the jury returned its penalty-phase recommendation of death:

{¶ 142} "The Court having polled the jury does find that this is the verdict of the jury in this case, and the sentence of death shall be imposed upon the Defendant.

{¶ 143} "A sentencing hearing will be set in this case * * * to place that verdict into effect. The Court will enter that verdict at that time."

{¶ 144} The defense filed an affidavit of disqualification against the trial judge, arguing that the trial judge's words evidenced a predisposition in favor of a death sentence. See R.C. 2701.03. However, the chief justice of this court found that the trial judge was not biased or prejudiced. "Isolated remarks made by a judge near the end of a three- or four-week trial are not sufficient to prove that the judge is biased or prejudiced." *In re Disqualification of Ambrose,* 110 Ohio St.3d 1220, 2005-Ohio-7154, 850 N.E.2d 722, ¶ 5.

{¶ 145} Under Section 5(C), Article IV of the Ohio Constitution, the chief justice or his designee has sole authority to determine whether a trial judge is disqualified. See *State v. Moore* (2001), 93 Ohio St.3d 649, 650, 758 N.E.2d 1130; *Beer v. Griffith* (1978), 54 Ohio St.2d 440, 441, 8 O.O.3d 438, 377 N.E.2d 775. In this case, the chief justice determined that the trial judge's June 16 remark did not establish bias or create any basis for disqualification. *Ambrose* at ¶ 5. That ruling is res judicata. *State v. Rogers* (1985), 17 Ohio St.3d 174, 186, 17 OBR 414, 478 N.E.2d 984. We reject the attempt to relitigate a settled issue and overrule Hale's 14th proposition of law.

{¶ 146} In his 15th proposition of law, Hale contends that the trial judge improperly considered victim-impact evidence in sentencing him to death.

{¶ 147} After the jury returned its sentencing recommendation on June 16, 2005, the trial judge scheduled a final hearing for the purpose of imposing sentence. This hearing was held on July 18, 2005. At that time, after hearing from counsel for both parties and giving Hale an opportunity for allocution, the trial judge explained why the aggravating circumstance outweighed the mitigating factors and announced his decision to sentence Hale to death. *After* that, the judge heard the statements of Douglas Green's sister and daughter. He then imposed sentence on all counts, both capital and noncapital.

{¶ 148} "Absent an indication that the trial court considered the victim-impact evidence in arriving at its sentencing decision, the admission of such evidence is not reversible error. * * * [T]his court will presume that a trial court considered only the relevant, material, and competent evidence in arriving at its judgment, unless the contrary affirmatively appears from the record." *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 131.

{¶ 149} The record contains no affirmative indication that the trial judge considered the statements of Green's relatives in sentencing Hale to death. To

the contrary, the judge announced his findings and sentence on the aggravated murder *before* hearing from Green's relatives. We therefore overrule Hale's 15th proposition of law.

{¶ 150} In his 16th proposition of law, Hale contends that flaws in the trial court's sentencing opinion invalidate his death sentence. Hale's principal claim is that the trial court failed to weigh the mitigating factors *collectively* against the aggravating circumstances. See *State v. Bays* (1999), 87 Ohio St.3d 15, 30, 716 N.E.2d 1126.

{¶ 151} In analyzing Hale's history, character, and background evidence, the trial court stated that the evidence deserved "some weight" but that its weight was "not *sufficient on its own* to overcome the Aggravating Circumstance." (Emphasis added.) However, the court later stated that the love and support of Hale's family would not be considered under the R.C. 2929.04(B)(7) catchall provision because "the Court previously considered this factor in mitigation and gave it some weight when the Court considered the Defendant's Character, Background and History." It appears from this passage that the trial court was trying to avoid giving double weight to the love and support of Hale's family and that the court was weighing history, character, and background together with the other factors. Thus, it is not clear that the trial court failed to weigh the mitigating circumstances collectively. Even if the trial court did make this mistake, our independent review will cure it. See *Bays*, 87 Ohio St.3d at 30–31, 716 N.E.2d 1126.

{¶ 152} Hale also faults the trial judge for relying on Curtiss Jones's expert opinion on blood-spatter evidence to support its finding that Green did not sexually assault Hale. This claim essentially duplicates Hale's tenth proposition of law, which we have already rejected, and which we now reject again.

{¶ 153} Next, Hale contends that the trial court "improperly diminished" the mitigating weight of his adjustment to prison. However, a trial court need not accept mitigating factors at the defendant's proposed valuation; their weight is for the trial court to determine. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. See also *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124; *State v. Wiles* (1991), 59 Ohio St.3d 71, 91, 571 N.E.2d 97.

{¶ 154} Finally, Hale contends that the trial court failed to explain why the aggravating circumstance outweighed the mitigating factors. We find that the opinion as a whole adequately explains this issue. The trial court explained that Hale's history, character, and background had some weight, but "there was also testimony concerning aspects of [Hale's] family life that were normal." The court further stated that Hale's adjustment to prison deserved "minimal" weight because of his pattern of escalating criminal behavior, culminating in murder. The court also explained why no other mitigating factors deserved any weight.

{¶ 155} In any case, "inadequate explanations of the weighing process do not constitute reversible error because any such error may be readily cured by this court's independent review." *State v. Keith* (1997), 79 Ohio St.3d 514, 533, 684 N.E.2d 47. Hale's 16th proposition of law is overruled.

### IX. Prosecutorial Misconduct

{¶ 156} In his 19th proposition of law, Hale accuses the prosecutors of misconduct. We will also consider section (G) of Hale's eighth proposition of law, which duplicates portions of Hale's 19th proposition of law.

### A. Discovery

{¶ 157} Hale contends that the state failed to afford timely discovery of the felony records of certain prosecution witnesses. See Crim.R. 16(B)(1)(a). However, Hale fails to explain how he was prejudiced. In each instance, the information was disclosed before the defense cross-examined the witness.

{¶ 158} Hale also contends that the state failed to timely disclose evidence regarding Hale's financial transactions. However, as Hale concedes, the trial court imposed a sanction on the state for this lapse. The trial court limited the state's financial evidence to that involving Hale's financial condition at the time of the murder, while excluding evidence involving bounced checks and identity theft by Hale—evidence holding greater potential for prejudice. Discovery sanctions are within the trial court's discretion, *Parson,* 6 Ohio St.3d at 445, 6 OBR 485, 453 N.E.2d 689, and Hale does not show that the judge abused his discretion here.

{¶ 159} Hale's other discovery-related claims duplicate claims made in Hale's first and eighth propositions of law, which we have overruled.

### B. Voir Dire

{¶ 160} Hale accuses the prosecutors of "plant[ing] prejudicial information in the jurors' minds" during voir dire. During general voir dire, the prosecutor asked the panel about familiarity with firearms, and when one juror mentioned owning a derringer, the prosecutor asked how many bullets a derringer holds. He further asked the panel members whether any of them had ever moved or carried a person larger than themselves. Additionally, he asked the panel members to remember the most traumatic event in their lives.

{¶ 161} Each of these questions related to issues raised at trial. The trial judge has discretion as to the scope of voir dire, and Hale does not demonstrate that the judge abused his discretion here.

### C. Hearsay

{¶ 162} Hale points to four instances in which the prosecutor presented hearsay. However, in three instances, the defense did not object, thereby

waiving any issue. In a fourth (the dollar value of Green's jewelry), an objection was sustained, and the jury never heard the testimony. An appellant cannot predicate error on objections the trial court sustained. *Viox v. Weinberg,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, ¶ 36.

### D. Leading Questions

{¶ 163} Hale lists 26 leading questions the prosecutor asked on direct examination. In 23 instances, the defense did not make a timely objection, so any issue pertaining to those questions is waived. In three instances, the defense did interpose timely objections. However, it is within the trial court's discretion to allow leading questions on direct examination. *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 190, 616 N.E.2d 909. Hale makes no attempt to explain how the trial court abused its discretion in overruling his objections. Nor does he explain why it was prosecutorial misconduct for the prosecutor to engage in conduct that the trial court had discretion to allow and did allow.

### E. Victim Impact

{¶ 164} Hale claims that the prosecutor introduced victim-impact evidence and argument in the guilt phase. In one instance, the defense failed to object, waiving the issue. In two instances, objections were sustained. As already noted, an appellant cannot predicate error on objections that the trial court sustained. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, ¶ 36. The rest of this claim duplicates section (C) of Hale's eighth proposition of law, which we have rejected.

### F. "Irrelevant" and "Inflammatory" Evidence

{¶ 165} Hale claims that the prosecutor introduced irrelevant and inflammatory evidence.

{¶ 166} First, Lashayla Hale testified that Hale had once told her that he had a gun and felt like shooting his mother's ex-boyfriend. (The prosecutor did not deliberately elicit the part about shooting the ex-boyfriend.) The trial court initially overruled a defense objection. The next day, the defense moved for a mistrial. The trial court offered to consider giving a curative instruction instead. However, for tactical reasons, the defense declined to request an instruction. Thus, Hale "cannot now complain that none was given." *State v. Davie* (1997), 80 Ohio St.3d 311, 322, 686 N.E.2d 245.

{¶ 167} Second, the prosecutor asked Lashayla, over objection, whether Hale had a drinking problem. This question was irrelevant to the guilt phase, but the error was harmless in view of the overwhelming evidence of Hale's guilt. In two other instances in which Hale objected at trial to questions asked of Lashayla, his

objections were sustained. See *Viox*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36.

{¶ 168} Third, the prosecutor asked Sergeant Baird about Hale's admission that he disposed of the gun, Green's clothing, and Green's shoulder bag. On objection, the prosecutor withdrew the question.

{¶ 169} The prosecutor's question violated the trial court's order imposing discovery sanctions. (See discussion of section (A) of Hale's eighth proposition of law.) However, the disposal of the shoulder bag was neither irrelevant nor inflammatory. In any event, at trial, Hale did not cite the irrelevant and inflammatory nature of the question as grounds for his objection, so this claim is waived.

{¶ 170} Finally, Hale claims the prosecutor made inflammatory comments about the evidence. The prosecutor referred to the items Hale had purchased to clean up the murder scene as the "murder scene clean-up kit." He also asked Sergeant Pestak whether a hat found in Hale's baggage had "three rough cut holes in it that would approximate if someone tried to wear it as a mask, two eye holes and a mouth hole." However, the defense did not object to these questions, so this issue is waived.

{¶ 171} The prosecutor also referred to Hale's confession as his "mea culpa" and "his two-hour long considered statement." Objections to these comments were sustained; hence, there was no error. *Viox*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36. The defense did not request curative instructions in either case, thus waiving any claim to such instructions. *Davie*, 80 Ohio St.3d at 322, 686 N.E.2d 245.

### G. Speculative Testimony

{¶ 172} Hale claims that Detective Grida gave testimony that was speculative, unreliable, and outside his personal knowledge. See Evid.R. 602 (witness may not testify to matters outside his personal knowledge).

{¶ 173} Grida testified that police believed that Hale had help moving Green's body because, given the route taken and the body's size, there would have been more abrasions on the outer garbage bag if only one person had dragged it. Hale's objection was overruled.

{¶ 174} This testimony may have been admissible as lay opinion under Evid.R. 701, as it was rationally based on Grida's perceptions and helpful to a clear understanding of a fact in issue. However, the state does not argue the point. In any event, given the overwhelming evidence of Hale's guilt, any error in admitting this testimony was harmless.

{¶ 175} Grida also testified about how blood may have gotten onto the wall of Room 231 and expressed an opinion that the lodge employees who found the body

could not have moved it. The defense did not object to this testimony, so any issue is waived.

{¶ 176} Hale also claims that Sergeant Pestak testified about matters outside his personal knowledge. Pestak testified that he "assume[d]" that Green's family last saw him on June 20 or 21, 2004. Pestak also identified a page in Green's receipt book and testified, "[I]t's signed by, I'm guessing it's signed Douglas Green." These matters had little or no importance to the case, and any error was harmless in light of the overwhelming evidence of guilt.

### H. Improper Rebuttal

{¶ 177} Johnny Smith, testifying about his 1998 rape accusation against Green, stated on direct examination that he had not been consulted about the plea bargain that reduced the charge to misdemeanor assault. On cross-examination, Smith admitted that the prosecutor's office had contacted him and that he had approved the plea bargain.

{¶ 178} On rebuttal, the state called Michael Nolan, the assistant prosecutor who had handled the 1998 case. Nolan confirmed that he had discussed the proposed plea bargain with Smith and that Smith had consented to it. Hale contends that Nolan's testimony violated Evid.R. 616(C), which states: "If offered for the sole purpose of impeaching a witness's testimony, extrinsic evidence of contradiction is inadmissible" unless permitted by Evid.R. 608(A), 609, 613, 616(A), or 616(B), or by the hearsay exception regarding learned treatises.

{¶ 179} But Hale did not object to Nolan's testimony at trial. Hence, this issue is waived, absent plain error. Nolan's testimony was not prejudicial in the least; Johnny Smith had already admitted on cross-examination that he had agreed to the plea bargain.

### I. Victim's Family

{¶ 180} At one point during trial, one of the prosecutors talked with Green's relatives in the courtroom. Hale claims that this conduct somehow constituted an emotional appeal to the jury. But there is nothing improper in a prosecutor's speaking to the victim's family, and Hale's claim regarding the effect on the jury is speculative.

### J. Guilt–Phase Closing Arguments

{¶ 181} Hale claims that several comments in the prosecutor's argument misrepresented evidence, shifted the burden of proof, or were inflammatory.

{¶ 182} The prosecutor said that Hale had "set up the meeting place" with Green on the day of the murder. This statement was not supported by evidence. However, a defense objection was sustained, so the trial court did not err. *Viox*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36. Moreover, the

defense did not request a curative instruction, so any error in the trial court's failure to give one is waived. *Davie*, 80 Ohio St.3d at 322, 686 N.E.2d 245.

{¶ 183} Hale claims that the prosecutor misrepresented evidence by stating that Hale "had a gun in that room, Room 260 on June 21st, 2004." A defense objection was overruled. Hale argues that the evidence—i.e., Hale's statement—showed that Green owned the gun. But the prosecutor's comment referred to Hale's *possession* of the gun, which was undisputed.

{¶ 184} The prosecutor also said that at the time Hale set up his meeting with Green, he "knew he had to be out [of the lodge] by the 22nd." That inference is a reasonable one based on the evidence. Lodge records, authenticated and explained by the lodge's owner, showed that Hale checked into the lodge for seven days' tenancy on June 8, 2004, and renewed his tenancy for another seven days on June 15, to expire on June 22.

{¶ 185} The prosecutor referred to certain facts as "undisputed": that Green was a 47–year–old husband and father, that phone records showed that Hale had called Green, that the Underground Railroad was closed on Mondays, and that Hale stole and used Green's credit card. Objections to these statements were overruled. These references were not improper. They were directed not toward the defendant's silence, but toward the strength of the state's case. *State v. Ferguson* (1983), 5 Ohio St.3d 160, 5 OBR 380, 450 N.E.2d 265, paragraph one of the syllabus. See also *State v. Webb* (1994), 70 Ohio St.3d 325, 328–329, 638 N.E.2d 1023.

{¶ 186} The prosecutor said that Hale's "picking up the pen with his left hand [when signing the *Miranda* waiver] was a lie." A defense objection was sustained, however, so no error occurred. *Viox*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36.

{¶ 187} The prosecutor asked "what became of" the gun that Hale told his sister Lashayla he had. A defense objection was sustained. The prosecutor then asked, "Where is it?" The trial court overruled a defense objection. Hale argues that the prosecutor's question improperly shifted the burden of proof onto him. We disagree. "The prosecution is not prevented from commenting upon the failure of the defense to offer evidence in support of its case." *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 490 N.E.2d 906.

{¶ 188} Hale claims that the prosecutor misrepresented "[r]oom logs showing when Hale came and went," but Hale does not explain how the prosecutor misrepresented the room logs.

{¶ 189} Finally, the prosecutor asked whether Hale's acts showed him to be a "person worthy of compassion" or "a person * * * [who] wasn't capable of showing concern for the person who was decomposing back in Room 231."

Defense objections were sustained. No error occurred. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36. Hale complains that the trial court gave no curative instruction, but Hale did not request one. Thus, his complaint about the lack of an instruction is waived. *Davie,* 80 Ohio St.3d at 322, 686 N.E.2d 245.

### K. Disparaging Defense Counsel

{¶ 190} Outside the jury's presence, the prosecutor accused defense counsel of acting in bad faith, trying to "create error" and to "set up" an ineffective-assistance claim. Hale contends that these statements "improperly chilled the defense" and "stifle[d] defense counsel's arguments." Nothing in the record supports Hale's speculation. If anything, the record suggests that the vigor of defense counsel's advocacy was unabated throughout the trial. Nor does Hale cite any authority for the proposition that such remarks, made outside the jury's presence, amount to reversible error.

{¶ 191} While approaching the bench to argue a defense objection, the prosecutor expressed the opinion that the objecting counsel was "out of [his] mind." Such a remark, made in front of the jury, would have been improper; an attorney may not disparage opposing counsel for making an objection. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203. However, nothing in the record shows that the jury could or did hear the prosecutor's remark.

{¶ 192} During the penalty phase, the prosecutor asked Dr. Fabian, the defense psychologist, whether he had ever worked for the county public defender's office. A motion for mistrial was denied. Hale fails to demonstrate that the trial court abused its discretion in denying a mistrial. See generally *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 510 N.E.2d 343 (grant or denial of mistrial is within trial court's discretion).

### L. Penalty–Phase Cross–Examination

{¶ 193} The prosecutor asked Dr. Fabian whether it was true that mitigating factors "can occur in individuals within the same family and they don't act out * * * in a criminal sense." This method was a proper way to highlight the fact that a bad upbringing does not necessarily cause criminal behavior. See *State v. Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 98; *State v. Newton,* 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 95.

{¶ 194} In cross-examining Dr. Fabian, the prosecutor raised the possibility that Hale might escape from prison. A defense objection was sustained. The defense specifically asked that no curative instruction be given at that time. The trial court offered to give one later if asked to do so. However, the defense never made any such request. Hence, no reversible error exists. *Viox,* 169 Ohio

App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36; *Davie*, 80 Ohio St.3d at 322, 686 N.E.2d 245.

{¶ 195} In two other instances, defense objections were also sustained at trial. The prosecutor asked Dr. Fabian whether he was "familiar with the Ohio prison riots that resulted in guard fatalities" and asked: "So the mere presence or fact of a mitigation evaluation or report does not in and of itself prove the existence of mitigation in that person's background?" The trial court did not allow Fabian to answer either question. Thus, no error was committed. *Viox*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36.

## M.  Penalty–Phase Closing Arguments

{¶ 196} First, Hale complains that the prosecutor stated in closing argument that "the attention and the sympathy that rightly should flow to that victim sometimes becomes perversely focused on the defendant." This statement was improper, because sympathy may play no role in the jury's decision. However, the trial court sustained a defense objection, and it had previously instructed the jury: "You must not be influenced by any consideration of sympathy or prejudice." Thus, the prosecutor's comment was not prejudicial.

{¶ 197} Second, Hale complains that the prosecutor displayed Green's photo to the jury during argument. As the photo was in evidence, however, it was not improper to display it to the jury.

{¶ 198} Third, the prosecutor argued that Hale had "no remorse and has no concern." Hale claims this was improper because he did not present remorse as a mitigating factor. See *DePew*, 38 Ohio St.3d at 289–290, 528 N.E.2d 542. But Hale did raise remorse as an issue by expressing remorse in his unsworn statement.

{¶ 199} Fourth, the prosecutor argued that during the robbery, Hale "made a choice to cock the gun, shoot him twice. * * * Reload that gun, and shoot him twice more * * *." Hale claims this narrative was improper because the circumstances of the murder cannot be used as aggravating circumstances.

{¶ 200} However, the prosecutor did not state that the circumstances of the murder were "aggravating circumstances." See *Wogenstahl*, 75 Ohio St.3d at 355–356, 662 N.E.2d 311. The prosecutor's argument dealt with prior calculation and design, which were elements of the felony-murder specification and which were therefore relevant to the sentencing. The existence of prior calculation and design had further relevance to this case because it rebutted the defense claim that Green had provoked his own murder.

{¶ 201} Fifth, the prosecutor stated that the issue was whether the mitigating evidence lessened Hale's "moral culpability." This statement was erroneous. See *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 115–

116. But cf. *Penry v. Lynaugh* (1989), 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (punishment "should be directly related to the personal culpability of the criminal defendant"), overruled on other grounds, *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. However, Hale did not object, and the comment was not plain error. See *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 138.

{¶ 202} Hale's remaining claims of improper argument involve statements to which he did not object at trial. Hale's failure to object waived each of these claims.

{¶ 203} Hale's 19th proposition of law and section (G) of his eighth proposition of law are overruled.

## X. Ineffective Assistance of Counsel

{¶ 204} In his 20th proposition of law, Hale claims that he received ineffective assistance from his trial counsel. To establish ineffective assistance, Hale must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 205} Hale divides his numerous ineffective-assistance claims into four categories: voir dire, guilt phase, penalty phase, and failures to object.

{¶ 206} *Voir Dire*: Hale contends that his counsel were ineffective because they did not challenge jurors No. 4 and 5 for cause. Hale claims these jurors were automatic-death-penalty jurors. However, the case for so regarding them was weak, as we explain above in discussing Hale's seventh proposition of law. It was therefore not ineffective assistance to fail to challenge them.

{¶ 207} Hale contends that his counsel should have challenged juror No. 7 for cause because the juror knew the victim. Juror No. 7 remembered Green as an entertainer who had been known locally when the juror was in her teens. However, juror No. 7 "didn't know him personally." Green was a "friend of a friend of a friend." The juror's interaction with Green was limited to saying "Hello" or "[H]ow you doing?" About three years before the trial, Green had sung at the wedding of the juror's brother, but the juror had been ill and did not remember him well. Juror No. 7 stated that her acquaintance with Green would not affect her ability to be fair and impartial.

{¶ 208} "There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case." *McQueen v. Scroggy* (C.A.6, 1996), 99 F.3d 1302, 1320. Juror No. 7 testified that her slight acquain-

tance with Green would not affect her impartiality, and her voir dire gives no reason to doubt this. The relationship was distant and casual, not "close and ongoing" as in *Wolfe v. Brigano* (C.A.6, 2000), 232 F.3d 499, 502. See *Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 618 (distinguishing *Wolfe*).

{¶ 209} Moreover, the defense had strong tactical reasons for wanting juror No. 7 to sit on the jury. Her religious beliefs emphasized that "thou shall not judge," and she believed her religion would deem it a sin to vote for a death sentence. In fact, for this very reason, the *prosecution* repeatedly (but unsuccessfully) challenged juror No. 7 for cause. Accordingly, defense counsel's failure to challenge juror No. 7 was neither deficient nor prejudicial.

{¶ 210} Hale contends that his counsel should have challenged juror No. 1 for cause because she could not fairly consider all three possible life sentences. Juror No. 1 stated that she would be open to a sentence of life without parole, but "probably would be against" anything less.

{¶ 211} But juror No. 1 also had strong leanings against capital punishment and thus was a desirable juror for the defense. She said in her questionnaire that the death penalty should be used only if there was "absolutely no doubt" of guilt. A death sentence "would be very hard for [her] to agree to." Her statements also reveal her strong sense of the seriousness and finality of the decision: "[I]t's so final that that's really a big decision to make." "[I]t's an incredibly serious undertaking."

{¶ 212} In the penalty phase of a capital case, counsel's primary objective is to avoid a death sentence. Obtaining a life sentence with the possibility of parole, as opposed to without it, is a secondary consideration. Thus, competent counsel could make a reasonable tactical decision to accept a juror whose answers indicated a strong reluctance to impose death, even though that reluctance may have come packaged with a predisposition against parole. Juror No. 1 was such a juror, and Hale's counsel did not perform deficiently by accepting her.

{¶ 213} Hale contends that defense counsel should have tried to rehabilitate prospective jurors No. 8, 28, and 41, each of whom was excused as unwilling to consider a death sentence. Hale's claim of prejudice is necessarily speculative, because we cannot know whether these jurors *could* have been rehabilitated. Hale's trial counsel saw and heard the jurors respond to the voir dire questions; we did not. We are therefore in no position to second-guess counsel on this point. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373.

{¶ 214} Hale claims his trial counsel misstated the law to the trial judge during voir dire. Trial counsel stated that in the penalty phase, the jury must initially consider whether the aggravating circumstances outweigh the mitigating factors. But Hale's trial counsel correctly stated the law. See *State v. Lindsey* (2000), 87 Ohio St.3d 479, 487, 721 N.E.2d 995; *State v. Brooks* (1996), 75 Ohio St.3d 148,

162, 661 N.E.2d 1030 (when jury cannot unanimously agree on a death sentence, it must move on to consider which life sentence is appropriate).

{¶ 215} There would have been no prejudice to Hale even if counsel's statement had been incorrect. No jurors were present when counsel made the statement at issue, and Hale makes no claim that the trial court gave incorrect jury instructions as a result of counsel's alleged error.

{¶ 216} Defense counsel did make an incorrect statement during the voir dire of juror No. 30. Both the trial court and defense counsel incorrectly referred to the mitigating factors outweighing the aggravating circumstances. However, in the penalty phase, the trial court correctly instructed the jury that the state had the burden of proving that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Thus, Hale was not prejudiced.

{¶ 217} Citing *Turner v. Murray* (1986), 476 U.S. 28, 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27, Hale contends that his counsel performed deficiently by failing to question the jurors about racial bias. However, *Turner* has no application to this case. *Turner* holds that a capital defendant accused of an *interracial* murder is entitled, *upon request,* to have prospective jurors informed of the race of the victim and questioned concerning racial bias. But this case does not involve an interracial murder.

{¶ 218} And *Turner* held only that the defense was *entitled* to engage in racial-bias inquiry, not that defense counsel *must* do so in order to effectively assist their client. We have recognized that "the actual decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel," *State v. Smith* (2000), 89 Ohio St.3d 323, 327, 731 N.E.2d 645, and we normally defer to counsel's judgment on this question. Id. at 328, 731 N.E.2d 645.

{¶ 219} We decline to deviate from that practice here. There was no discernible reason to ask about racial bias. This case did not involve an interracial murder, nor did the evidence raise any racial issues. In *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, we held that defense counsel's failure to examine racial attitudes on voir dire was not ineffective assistance, even though *Watson* did involve an interracial murder. Because the case did not involve any issue of "racial confrontation," defense counsel "could have properly determined that the examination of jurors' racial views * * * would be unwise." *Smith,* 89 Ohio St.3d at 328, 731 N.E.2d 645 (noting risks of examining racial prejudice on voir dire). Hence, it was neither deficient performance nor prejudicial for counsel not to ask racial-bias questions.

{¶ 220} Hale contends that his counsel, during voir dire, failed to ensure that prospective jurors understood the meaning of aggravating circumstances. In essence, this issue recasts Hale's sixth proposition of law as an ineffective-counsel claim. However, because Hale does not contend that the penalty-phase instruc-

tions were incorrect, no reason exists to believe that the jurors actually seated at trial misunderstood the meaning of aggravating circumstances. Hale accordingly has failed to show the prejudice requisite to an ineffective-assistance claim.

{¶ 221} *Guilt Phase*: Hale claims his counsel were ineffective because they did not request funds for a crime-scene expert. According to Hale, such an expert could have rebutted the "erroneous" testimony of Curtiss Jones. This claim is conjectural. See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 98. Hale also claims his counsel failed to perform a sufficient investigation. This claim is also speculative: nothing in the record shows the extent of counsel's investigation.

{¶ 222} Hale claims his counsel erred by failing to call him to testify in his own behalf. Hale contends that, in a self-defense case, it can *never* be sound trial strategy to decline to present the defendant's testimony.

{¶ 223} No such blanket statement can be made. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674. In this case, by relying on Hale's confession instead of his live testimony, Hale's counsel were able to present his story to the jury without subjecting him to cross-examination. In view of the many weaknesses in Hale's story, this defense strategy was reasonable.

{¶ 224} Hale also contends that introducing his written statement, instead of his live testimony, prejudiced him because the written statement mentioned that Hale had served 12 years in prison. Hale admits that had he testified, his felony conviction might have been introduced to impeach him. But he says that had he testified, he could have explained that he had been sexually abused in prison, thus explaining why he feared rape when he allegedly encountered Green nude on his bed.

{¶ 225} But Hale ignores the fact that his written statement contains precisely the information that he claims only his live testimony could have provided. Hale's statement says: "I not too long ago served 12 long years in prison *and had fought off unwanted advances before*. I was prepared in prison though. You expected this type of thing. No way in hell did I expect this out here." (Emphasis added.) Thus, Hale's argument lacks merit.

{¶ 226} Hale claims that his counsel, by arguing that Hale did not commit aggravated robbery by taking Green's property after killing him, undermined their credibility with the jury. This claim is inherently speculative and finds no support in the record.

{¶ 227} Hale contends that counsel, in cross-examining Sergeant Baird, "improperly emphasized" Baird's claim that he had told Hale that Green might be

bisexual, thus planting the idea of a sexual assault in Hale's head. But the cross-examination was a matter of debatable trial tactics, which do not constitute ineffective assistance. See *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189.

{¶ 228} Hale contends that counsel were ineffective because they reviewed records related to state witnesses while the witnesses were testifying. However, Hale fails to identify any resulting prejudice.

{¶ 229} Hale contends that defense counsel, after persuading the trial court to exclude evidence of his bounced checks, opened the door to such evidence by raising the subject on cross-examination of Sergeant Pestak. Defense cross-examination of Pestak similarly opened the door to testimony about Hale's excluded oral statements to police. However, these alleged errors were not prejudicial in light of overwhelming evidence of Hale's guilt.

{¶ 230} *Penalty Phase*: After the guilt-phase verdicts, the trial court released the jurors from sequestration and stated that they were "discharged." However, the court asked them to remain for further instructions. Those instructions informed the jurors that they were "still jurors on this case" and that they must continue to obey the court's instructions not to discuss the case with anyone and not to watch newscasts or read newspapers.

{¶ 231} Hale contends that because the jurors had been "discharged" after the guilt phase, his trial counsel should have requested a voir dire of the jury before the penalty phase to ensure that they had not discussed the case in the interim. See generally *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654. However, a *Remmer* hearing is required only "when the trial court learns of 'private communication, contact, or tampering * * * with a juror during a trial about the matter pending before the jury.'" *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 263, quoting *Remmer*, 347 U.S. at 229, 74 S.Ct. 450, 98 L.Ed. 654. In this case, there was no allegation that any such contact occurred. Nor does the trial court's use of the word "discharged" justify the supposition that the jurors discussed the case between the guilt and penalty phases. There was thus no reason for counsel to ask for a voir dire.

{¶ 232} Hale contends that his counsel did not adequately investigate mitigating factors or prepare their penalty-phase case. He claims that more witnesses could have been called, but this argument is speculative, and even if Hale is correct, it would not necessarily indicate that counsel's investigation was inadequate. Similarly, Hale criticizes the testimony of Dr. Fabian, the defense psychologist, claiming that counsel failed to "adequately supervise and direct" Fabian. This argument is also speculative.

{¶ 233} *Failures to Object:* Finally, Hale complains that his trial counsel failed to object to numerous alleged errors. Each of Hale's claims recasts one of his

substantive propositions of law into an ineffective-assistance claim. However, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. In our view, none of Hale's claims of error is so compelling that competent counsel would have been obligated to object to them at trial, nor were they prejudicial.

{¶ 234} Hale's 20th proposition of law is overruled.

## XI. Cumulative Error

{¶ 235} In his 21st proposition of law, Hale contends that his trial was "replete with" errors whose cumulative effect was prejudicial. However, he specifically cites only three claimed errors.

{¶ 236} First, he claims that defense counsel were not permitted to participate in the in camera inspection of witness statements under Crim.R. 16(B)(1)(g), conduct that prevented him from exposing an inconsistency between Sergeant Baird's report and his trial testimony. However, there was no such inconsistency, as we concluded in discussing Hale's first proposition of law.

{¶ 237} Second, he claims that his ability to present a defense was hindered by the trial court's limitation on Johnny Smith's testimony. But the trial court did not err by limiting Smith's testimony, as we explained in discussing section (F) of Hale's eighth proposition of law.

{¶ 238} Third, he claims that his ability to present a defense was also hindered by Michael Nolan's improper rebuttal testimony. But Hale waived this claimed error at trial, as we stated in our discussion of Hale's 19th proposition of law.

{¶ 239} Thus, of the alleged errors Hale cites, two were not errors at all, and the third was waived. Hale's 21st proposition of law is overruled.

## XII. Settled Issues

{¶ 240} In his 22nd proposition of law, Hale attacks the constitutionality of Ohio's death-penalty statutes. His claims are summarily overruled on authority of *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus; *State v. Mapes* (1985), 19 Ohio St.3d 108, 116–117, 19 OBR 318, 484 N.E.2d 140; *State v. Buell* (1986), 22 Ohio St.3d 124, 137–138, 22 OBR 203, 489 N.E.2d 795; *State v. Steffen* (1987), 31 Ohio St.3d 111, 124–125, 31 OBR 273, 509 N.E.2d 383; *State v. Durr* (1991), 58 Ohio St.3d 86, 97, 568 N.E.2d 674; *State v. Mills* (1992), 62 Ohio St.3d 357, 371, 582 N.E.2d 972; *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 103–104, 656 N.E.2d 643. See generally *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus (authorizing summary disposition of settled issues).

### XIII.  Noncapital Sentencing Issues

#### A.  *Blakely-Foster* Issue

{¶ 241} In his second proposition of law, Hale contends that his sentences on the noncapital offenses should be vacated, and his case remanded for resentencing on those offenses, pursuant to our decision in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, following *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403.  See also *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547.  The state agrees that Hale's case should be remanded for resentencing on the noncapital crimes.

{¶ 242} However, Hale was sentenced on July 18, 2005.  Although *Blakely* had been decided the previous year, Hale did not raise a *Blakely* objection in the trial court.  Thus, he has forfeited this claim.  See *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 31; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 205.

{¶ 243} The noncapital sentences imposed in this case were not plain error. "Nothing in the record suggests that the noncapital sentencing would have been different if [the defendant] had been sentenced in accordance with *Blakely* and *Foster.*"  *Frazier* at ¶ 208.  Accordingly, we overrule Hale's second proposition of law and, for the same reason, deny Hale's motion to remand for resentencing.

#### B.  Court Costs

{¶ 244} The trial court imposed court costs on Hale in the amount of $2,826.52. Hale did not then object.  Now, in his 17th proposition of law, he claims that he is indigent and that assessing costs violates the "spirit" of the Eighth Amendment.

{¶ 245} Hale has waived this issue by failing to object.  See *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 23 (indigent defendant's motion for waiver of costs must be made at time of sentencing).  There was no plain error.  *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, paragraphs one and two of the syllabus, holds that costs must be assessed against, and may be collected from, indigent defendants, and Hale cites no authority to support his "spirit-of-the-Eighth-Amendment" claim.  Hale's 17th proposition of law is overruled.

### XIV.  Independent Sentence Review

{¶ 246} In his 18th proposition of law, Hale contends that the aggravating circumstances in his case do not outweigh the mitigating factors beyond a reasonable doubt.  This claim invokes our duty under R.C. 2929.05 to independently review his sentence of death.  We now proceed to do so.

## Aggravating Circumstances

{¶ 247} Under R.C. 2929.05(A), we must determine whether the evidence supports the finding of the aggravating circumstances. The sole aggravating circumstance in this case is the robbery-murder specification.

{¶ 248} The evidence easily supports Hale's conviction of this specification. Hale admitted that he himself shot Green; thus, Hale was the principal offender in the aggravated murder. The evidence of aggravated robbery is clear: Hale was arrested in possession of Green's SUV, and he used Green's Visa card after the murder.

## Mitigating Factors

{¶ 249} Hale claims that the evidence establishes the following mitigating factors: defendant's history, character, and background; that the victim induced or facilitated the offense, R.C. 2929.04(B)(1); duress, coercion, or strong provocation, R.C. 2929.04(B)(2); remorse; the love and support of his family; and the likelihood that Hale will successfully adapt to prison. R.C. 2929.04(B)(7) (other factors).

## History, Character, and Background

{¶ 250} In the penalty phase, Hale introduced testimony from his three sisters and from Dr. John Fabian, a forensic and clinical psychologist. Hale also made an unsworn statement.

{¶ 251} The defense witnesses testified extensively regarding Hale's family and childhood. Hale was born in 1968, the eldest of four children. His father, who worked for LTV Steel for 30 years, was described by Hale's sister Latisha as pretty stable. Hale's mother worked for 19 years for the Cleveland Catholic Diocese. However, she had a drinking problem and was unfaithful to her husband. These issues caused conflict in their marriage, sometimes leading to physical violence between the spouses. According to Dr. Fabian, Hale's father also had a drinking problem.

{¶ 252} Hale had an unusually close relationship with his mother, who treated him less as a child than as a "best friend" and confidant. According to Dr. Fabian, some of her confidences involved things "that perhaps he was too young to understand or to hear about." Hale usually sided with his mother against his father, conflict that sometimes led to physical confrontations between the two.

{¶ 253} When Hale was about seven, his mother left his father. She took Hale and his sister Laquatia to California. Initially, they stayed with Mrs. Hale's sister and her husband in the Watts neighborhood of Los Angeles. According to Laquatia, an older female cousin sexually molested Hale during this period.

{¶ 254} Hale was exposed to a violent environment during this period. There were conflicts among the adults, with Mrs. Hale's sister accusing her of sleeping with her husband. Eventually, the Hales moved out and went to live in "the projects." According to Laquatia, Mrs. Hale "had * * * different men in and out" during this time. According to Hale, his mother attempted suicide twice while in California.

{¶ 255} After about a year, Hale's mother returned to Cleveland and to her husband. Hale's father forgave her and took her back into his household. Hale's mother stopped drinking, spent more time with her children and became "nurturing." During this period, Hale "calmed down," became more outgoing, and did well in school. Life was "basically decent" and "kind of peaceful."

{¶ 256} Hale's life changed for the worse when he was about 13. His mother resumed drinking, fighting with her husband, and seeing other men. Hale began associating with delinquent peers, cutting school, stealing, and rebelling.

{¶ 257} Hale's sisters all testified that they love him. They credited him with numerous good qualities: intelligence, creativity and artistic ability, the ability to plan and to solve problems, a positive attitude, enthusiasm, willingness to work, compassion, and "big dreams" about helping the homeless. They described him as loving, gentle, pleasant, helpful, religious, a comforter, and a "defender" who protected his sisters. They felt that after his release from prison, he had been trying to "keep straight," to "get * * * on the right track." Laquatia testified that Hale assisted her with a mentoring program at her church.

{¶ 258} Dr. Fabian, the defense psychologist, interviewed Hale four times and also interviewed Hale's sisters. Dr. Fabian's opinion was that Hale's personality and background exhibit a number of risk factors associated with violent behavior.

{¶ 259} He divided these factors into four categories. "Individual factors" were Hale's aggressive personality and antisocial attitudes. "Family factors" included the instability of Hale's family, his early separation from a parent, "caregiver disruption," his parents' substance abuse, family conflict, and exposure to violence. "School factors" were Hale's academic failure and lack of commitment to school. "Peer-related factors" included Hale's growing up in a poor neighborhood where he was exposed to crime, weapons, and substance abuse.

{¶ 260} Dr. Fabian further opined that Hale has "very poor" coping skills. He has poor judgment, difficulty tolerating stress, poor impulse control, and a tendency to misperceive events. He uses substance abuse and violence to cope.

{¶ 261} However, Fabian also believed that Hale's prison records showed adequate or good adjustment to prison. Hale obtained a GED in prison, took college courses, obtained counseling, and completed two programs for substance abuse. He became a counselor himself and also tutored illiterate prisoners.

{¶ 262} Despite the stress of prison, Fabian testified that Hale had committed no "violent infractions" during his 12–year incarceration. However, in his unsworn statement, Hale said that he did "a lot of fighting" during his first two years, resulting in "a lot of hole time."

{¶ 263} Fabian also believed that Hale is unlikely to commit violent acts in prison. Fabian testified that life-sentenced inmates have rates of prison violence similar to the low rates of death-row inmates and "much lower" than those of "general offenders." He also noted the phenomenon of "age burn-out": beginning between the ages of 35 and 40, an inmate's risk of violent behavior drops. (Hale was 37 when he was tried.)

{¶ 264} Hale has no history of mental illness, and Fabian did not diagnose him as mentally ill. Fabian placed Hale's intelligence in the low-average-to-average range, making him "brighter than most capital offenders." Hale was not intoxicated at the time of the murder.

{¶ 265} Hale's history, character, and background have some mitigating weight. Hale spent significant portions of his childhood in an unstable environment. But we have seldom given decisive weight to this factor. See, e.g., *State v. Campbell* (2002), 95 Ohio St.3d 48, 51–54, 765 N.E.2d 334; *State v. Murphy* (1992), 65 Ohio St.3d 554, 585–586, 605 N.E.2d 884; *State v. Cooey* (1989), 46 Ohio St.3d 20, 41, 544 N.E.2d 895. Here, we find that it is entitled to minimal weight. Hale's father was stable and responsible. During most of Hale's childhood, his mother was neither stable nor responsible, but during the years when she had stopped drinking, even she managed to provide maternal nurturing.

### Victim's Provocation or Inducement of the Offense

{¶ 266} Hale's claims of victim inducement and provocation are both based on his allegation that Green sexually assaulted him. That allegation, we find, is not worthy of belief. Hale's version of the shooting was both internally inconsistent and inconsistent with the evidence at trial.

{¶ 267} In his statement, Hale claimed that he fired the first two shots while Green's head was in contact with Hale's crotch and Green had hold of Hale's left wrist. But Hale also admitted that he shot Green with the gun in his *right* hand, and the autopsy showed that all four shots entered the *right* side of Green's head. This fact indicates that Green was facing either away from Hale or to Hale's right when Hale shot him. Similarly, the presence of gunshot residue on Green's *right* hand does not make sense if, as Hale claimed, Green was using that hand to hold Hale's *left* wrist at the time of the shooting.

{¶ 268} Hale further claimed that after the first two shots, Green was still trying to get up. This action was impossible. According to expert medical testimony, at least three of the four shots—and therefore at least one of the first

two shots—would have rendered Green unable to engage in any voluntary movement.

{¶ 269} Hale claimed that he backed away from Green after firing the first two shots. But three of the four shots—and therefore at least one of the second two shots—were contact wounds. Hale never explained how he inflicted one or more contact wounds *while backing away* from Green, who (according to Hale) was lying on the floor at the time.

{¶ 270} Hale claimed that Green was at the foot of the bed when Hale first shot him. But police found a small, circular spot of blood on the headboard of the bed. According to forensic expert Curtiss Jones, the spot's origin was probably no more than three to four feet from the headboard.

{¶ 271} Hale also claimed that he shot Green with Green's own gun. But when he threatened Green with that gun, he claimed, Green was unafraid because Green did not believe the gun was loaded.

{¶ 272} Finally, Hale claimed he and Green met at the Underground Railroad on June 21, 2004. But June 21 was a Monday, and the testimony of two witnesses, including the owner of the Underground Railroad, established that the Underground Railroad was closed on Mondays.

{¶ 273} On the record before us, we find that no mitigating factor exists under R.C. 2929.04(B)(1) or (2).

## Remorse

{¶ 274} Hale's expression of remorse is entitled to minimal weight at best. See *State v. Post* (1987), 32 Ohio St.3d 380, 394, 513 N.E.2d 754. Moreover, the sincerity of his remorse is questionable, inasmuch as he concocted a false story in order to blame his victim for the murder. See *State v. Wiles* (1991), 59 Ohio St.3d 71, 93, 571 N.E.2d 97 (attempts to avoid responsibility may offset remorse). We find that remorse has no weight in this case.

## Prospect of Adapting to Prison

{¶ 275} Hale's prospect of successfully adapting to prison is not a compelling mitigating factor, but it does carry some weight. See, e.g., *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 281.

## Other Mitigating Factors

{¶ 276} No other mitigating factors apply. There is nothing mitigating in the nature and circumstances of the offense. Green was shot four times in the head at close range, a method that suggests a calculated, execution-style murder. See *Campbell,* 95 Ohio St.3d at 51, 765 N.E.2d 334.

{¶ 277} Hale's mitigation adds up to little. We find that the robbery-murder aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 278} The death sentence is also proportionate to death sentences we have approved in robbery-murder cases. See, e.g., *State v. Allen* (1995), 73 Ohio St.3d 626, 644, 653 N.E.2d 675; *State v. Tyler* (1990), 50 Ohio St.3d 24, 42, 553 N.E.2d 576; *State v. Scott* (1986), 26 Ohio St.3d 92, 107, 26 OBR 79, 497 N.E.2d 55 (attempted robbery).

{¶ 279} Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

William D. Mason, Cuyahoga County Prosecuting Attorney, and Jon W. Oebker, Blaise D. Thomas, and Jennifer A. Driscoll, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, Kelly L. Culshaw, Supervisor, Death Penalty Division, and Ruth L. Tkacz and Kimberly S. Rigby, Assistant Public Defenders, for appellant.